# CHARLESTON.

TOMPKINS *v.* THE PACIFIC MUTUAL LIFE INSURANCE COMPANY.

Submitted February 12, 1903.    Decided May 2, 1903.

1.   ACCIDENT INSURANCE—*Examination.*

Only a right of examination, as to an injured person enti-
tled to weekly indemnity under an accident insurance policy,
is conferred upon the company issuing the policy, by the fol-
olwing clause, contained therein: "Any. medical adviser of
the company shall be allowed to examine the person, or body
of the injured in respect to an injury or cause of death in
such manner and at such times as he may require."   (p. 491). ·

2.   ACCIDENT INSURANCE—*Negligence.*

The relation of master and servant subsists between the
company and .its medical adviser in the exercise of such right
of examination, and the company must answer for injuries,
resulting from· the negligence or misconduct of its agent in
the premises.   (p. 492).

3.   ACCIDENT INSURANCE—*Examination.*

Though the insured is not bound to submit to such exami-
nation, and may refuse at the risk of loss of his indemnity;
or of litigation on account of his refusal, he may submit to it
without losing his right to exact care and skill in its exer-
cise; and it is no defense to his action that he consented to
examination in .a particular manner, if he did so in pursuance
of a request or demand that it be so made.   (p. 491).

4.   ·INSURANCE—*Physician.*

Between the physician and insured, in such cases, the law,
governing the relations of physician and patient, does not
apply.   (p. 499).

5.   INSURANCE—*Physician—Negligence.*

Where the injury of the insured is a sprain of the foot, re-
quiring a plaster cast or similar appliance to hold· the injured
ligaments in place until they heal or regain strength, and the
agent, in making the examination, removes, and fails to· re-
place, such appliance, and injury results therefrom, he is guil- ,
ty of negligence for which his principal must answer in dam-
ages.   (p. 499). .

6.   INSTRUCTION. .

The· court properly refuses an instruction to the effect that
the jury, in passing upon the testimony of a party, may take
·into consideration his situation and interest in the result of

the verdict and all the circumstances surrounding him, and give to it only such weight as they may deem it fairly entitled to, when a witness against him is deeply interestd in a moral sense, and no such direction as to his testimony is included. (p. 494).

Error to Circuit Court, Cabell County.

Action by George H. Tompkins against the Pacific Mutual Life Insurance Company. Judgment for plaintiff. Defendant brings error.

*Affirmed.*

SIMMS & ENSLOW, for plaintiff in error.

HARVEY, WIATT & SWITZER, for defendant in error.

POFFENBARGER, JUDGE:

On the 30th day of September, 1898, George H. Tompkins, a resident of Clifton Forge, Virginia, instituted an action in the circuit court of the United States in the district of West Virginia, against the Pacific Mutual Life Insurance Company, a California corporation, doing business in West Virginia, for the recovery of damages for an alleged wrong, on an alleged cause of action accruing to him in October, 1897, in which action he recovered a judgment, which was afterwards reversed by the United States Circuit Court of Appeals, and the action directed by said court to be dismissed for want of jurisdiction, which was accordingly done by the said circuit court. Within one year after the dismissal aforesaid, to-wit, on the 3rd day of November, 1900, said Tompkins instituted this suit in the circuit court of Cabell County for the same cause of action, alleging in his declaration the prosecution and dismissal of said former action, and that this action was brought within one year after said dismissal. To the declaration and each count thereof, the defendant demurred, after having had oyer of the writ and return, which demurrer was overruled, and thereupon a plea of not guilty was entered. The defendant plead also the statute of limitations, and the plaintiff was permitted to file his replication in writing to said plea, setting up the pendency of said former suit for the same cause of action, its dismissal for want of jurisdiction and the commencement of this suit within one year

thereafter. Trial was had and a verdict rendered for the plaintiff, assessing his damages at two thousand dollars, and, after overruling a motion to set aside the verdict, judgment was rendered accordingly.

Said replication was filed under section 19 of chapter 104 of the Code, which reads as follows: "If any action, commenced within due time, in the name of or against one or more plaintiffs or defendants, abate as to one of them by the return of no inhabitant, or by his or her death or marriage, or if, in an action commenced within due time, judgment (or other and further proceedings) for the plaintiffs should be arrested or reversed, on a ground which does not preclude a new action for the same cause, or if there be occasion to bring a new suit by reason of the said cause having been dismissed for want of security for costs, or by reason of any other cause, which could not be plead in bar of an action, of the loss or destruction of any of the papers or records in a former suit which was in due time; in every such case, notwithstanding the expiration of the time within which a new action or suit must otherwise have been brought, the same may be brought within one year after such abatement, dismissal or other cause, or after such arrest or reversal of judgment, or such loss or destruction but not after."

In support of its contention that the court erred in permitting said replication to be filed, the plaintiff in error relies upon two Virginia decisions and one Tennesse decision, and the defendant in error relies upon a decision of the Supreme Court of the United States, construing the Tennessee statute and an Ohio decision construing a similar section of the Ohio Code. The first Virginia case is *Gray's Adm'x.* v. *Berryman,* 4 Munf. 181. The Virginia statute construed in that case provided that, if judgment for the plaintiff be reversed by error, or judgment be given against the plaintiff upon matter alleged in arrest of judgment, that he take nothing by his plaint, writ or bill a new action might be commenced within one year after such reversal or judgment against the plaintiff. The other case is that of *Manuel* v. *Railroad Co.,* 37 S. E. 957, construing the present Virginia statute which provides that if an action commenced in due time abate by the return of no inhabitant or by the death or marriage of the defendant, or if,

in such action, judgment for the plaintiff be arrested or reversed upon a ground which does not preclude a new action for the same cause, or the plaintiff shall proceed in the wrong form or bring the wrong form of action, and judgment be rendered against him solely upon that ground, a new action may be brought within one year after such reversal or judgment. In the first of said two Virginia cases a suit in equity had been brought and dismissed for want of jurisdiction and it was held that an action at law for the same cause of action thereafter commenced was not within the exception. In the second, the plaintiff had taken a non-suit, and thereafter instituted another action for the same injury, and it was held that that case was not within the exception to the statute of limitations.

The Tennessee statute reads as follows: "If the action is commenced within the time limited, but the judgment or decree is rendered against the plaintiff and upon any ground not concluding his right of action, or where the judgment or decree is rendered against the plaintiff and is arrested or reversed on appeal, the plaintiff, or his representativs and privies, as the case may be, may from time to time commence a new action within one year after the reversal or arrest." The Supreme Court of Tennessee, in *Sweet* v. *Electric Light Co.,* 97 Tenn. 252, held that a suit commenced in a court having no jurisdiction and dismissed for want thereof, was a nullity and that as, in such case, no action had been commenced within the the meaning of the statute, such proceeding did not prevent the running of the statute, nor bring the case within the exception. That is the contention of the plaintiff in error, this cause of action having been first set up in a court having no jurisdiction and there dismissed on that ground, and then sued on in the State court more than one year after the accrual of the right of action, but within one year after the dismissal of the proceedings in the federal court.

In *Smith* v. *McNeal,* 109 U. S. 426, the Supreme Court of the United States construed the same Tennessee statute and arrived at conclusion seemingly in conflict with that announceed by the Tennessee court. Said case was decided in 1887, and the Tennessee case of *Sweet* v. *Electric Light Co.* in 1898 and, strange to say, the Tennessee court did not even notice the

former decision of a similar question upon the same statute by the Supreme Court of the United States. There is a distinction between the two cases, however. In *Smith* v. *McNeal,* the dismissal was for want of the allegation of a jurisdictional fact which actually existed and which, if alleged, would have given jurisdiction. In the Tennessee case, the former action had been brought in a court in which jurisdiction could not have been shown in the declaration. The construction given the statute in *Sweet* v. *Electric Light Co.* may be said to find some countenance in the opinion delivered by Mr. Justice Woods in *Smith* v. *McNeal,* where it is said: "Cases might be supposed, perhaps, where the want of jurisdiction in the court was so clear that the bringing of a suit therein would show such gross negligence and indifference as to cut the party off from the benefit of the saving statute, as if an action of ejectment should be brought in a court of admiralty, or a bill in equity should be filed before a justice of the peace."

The latest case bearing upon the question is *Railroad Co.* v. *Bemis,* 64 O. St. 26, decided in January, 1901, construing the Ohio statute which reads as follows: "If, in an action commenced, or attempted to be commenced, in due time, a judgment for the plaintiff be reversed, or if the plaintiff fail otherwise than upon the merits, and the time limited for the commencement of such action has, at the date of such reversal or failure, expired, the plaintiff, or if he die and the claim of action survive, his representatives may commence a new action within one year after such date—and this provision shall apply to any claim asserted in any pleading by a defendant." There, the status of the case was very much like that of this one. The action had first been brought in the federal court and dismissed for want of jurisdiction, and then brought in the State court, and it was held that the right of action was within the saving clause of the statute of limitations. The opinion delivered is very exhaustive and shows that the matter has been thoroughly considered. It analyzes fully the opinions in *Smith* v. *McNeal* and *Sweet* v. *Electric Light Co.,* construing the similar Tennessee statute. Among other things that opinion says: "In no text-book, and in no reported case cited to us save *Sweet* v. *Electric Light Company, supra,* is there any statement or intimation that the question of the jurisdiction of the court has any potency whatever

in determining what is, and what is not, an action, and we are convinced that in Ohio, whatever may be the rule elsewhere, there is no authority for the distinction which counsel seek to draw, and we are equally clear that it rests upon no substantial ground."

Our statute seems to be somewhat broader, or, to say the least, more positive and affirmative in the expression of the width of its scope than any of the other statues; for it says "if there be occasion to bring a new suit by reason of the said cause having been dismissed for want of security for costs, or by reason of any other cause, which could not be pleaded in bar of an action," a new action may be brought within one year after the dismissal. It is a highly remedial statute and ought to be liberally construed for the accomplishment of the purpose for which it was designed, namely, to save one who has brought his suit within the time limited by law, from loss of his right of action by reason of accident or inadvertence, and it would be a narrow construction of that statute to say that, because a plaintiff had, by mistake, attempted to assert his right in a court having no jurisdiction, he is not entitled to the benefit of it. In this connection, *Lawrence* v. *Winifrede Coal Co.*, 48 W. Va. 139, is relied upon by plaintiff in error. That was a case in which the plaintiff failed, after having brought his suit, to file his declaration within three months, by reason of which his action was dismissed at rules. He claimed the benefit of said section 19 of chapter 104 of the Code, and it was held that he was within the letter of it, but that he could not claim the benefit of it for the reason that the dismissal was wholly imputable to his voluntary abandonment of the suit. In the opinion of the Court, delivered by JUDGE BRANNON, it is said, "He either intentionally abandoned his first suit, or neglected it, which operated in law to discontinue it. It is a voluntary dismissal, or call it a discontinuance, by reason of the plaintiff's non-action." Here it cannot be said that the plaintiff below had voluntarily dismissed his former action in the federal court, for he prosecuted it to final judgment and defended the writ of error in the appellate court, and went out of the court, not by reason of his failure to prosecute, but by force of the strong hand of the court, pronouncing the law against him on the question of jurisdiction. The two cases are not analogous, unless we adopt the

reasoning of the Tennessee court whereby a distinction is made upon very narrow and technical grounds which have been declared by another reputable court, upon an apparently more mature and thorough consideration, to be unsound.

In support of the demand set up in this action, the principles of law, imposing upon a master liability for the acts of his agent, are relied upon; it being insisted that the injury for which damages are claimed from the defendant, is the result of a negligent act of the defendant by its agent. Defendant below, plaintiff in error, insists that the injurious act, if done by its agent, was outside of the scope of his agency or authority. These contentions, upon the peculiar facts involved, present a novel case and a question rather difficult of solution.

Tompkins, a brakeman on the C. & O. Ry., holding an insurance policy issued by the defendant company, providing, among other things, for the payment of a weekly indemnity of ten dollars, in case of such injury, by external, violent and accidental means, as should, independently of all other causes, immediately, continuously and wholly disable and prevent him from engaging in any work or occupation for wages, stepped on a peach seed at Huntington, West Virginia, on the 2nd day of July, 1897, whereby his right foot and ankle were so wrenched and sprained that, after having subsequently made three trips as brakeman, the injury required attention, and his physician placed his foot in a plaster of paris cast to keep it and the muscles and ligaments rigidly in a certain position, upon the theory that the ligaments, supporting the lower part of the foot, had been badly strained, lacerated or broken loose, and must be in some way, held in place long enough to permit them to heal and regain sufficient strength to support the lower part of the foot. This was done by Dr. Geo. S. Bonner of Clifton Forge, on or about the 5th day of September, 1897, who says his conclusion, upon his diagnosis, was that the injury was "nothing more than the weakness which usually follows a sprain and the susceptibility to rheumatism or something of that sort." On or about the 8th day of October, 1897, said cast was taken off by Dr. James F. Hughes, who was the examining surgeon, or medical adviser, of the insurance company, and had come to Tompkins' house for the purpose of making an examination of Tompkins in respect to the injury, under a clause in the

policy, requiring the insured to allow such examination in such manner and at such times as the medical adviser might require. After making the examination, Dr. Hughes left without replacing the cast or putting on another, and the plaintiff's foot soon became worse and he has partially lost the use of it, although, after the lapse of considerable time, an effort was made to restore it to health and strength by again encasing it as before, and other treatment. There is a sharp conflict as to what occurred between the plaintiff and Dr. Hughes at the time the examination was made, the claim on the part of Tompkins being that the casing was taken off against his protest and by his unwilling submission to the exercise of the company's right of examination as proposed and executed; and, on the part of the company that Tompkins consented to the removal of the support and the discontinuance of its use.

This explanation suffices to fairly indicate the nature of the objection made to the declaration, which sets out, in varying language, in its four counts, matter which is substantially covered by the foregoing statement, and alleges the duty of the defendant to use care, skill and a due regard for the interests and welfare of the plaintiff in the exercise of its right of examination, and its failure so to do, as well as its wrongful and negligent conduct in removing the plaster cast and failing to restore it, and in requiring and causing the plaintiff to let it remain off.

The objection, on demurrer as indicated in the brief filed for plaintiff in error is that "In various counts in the declaration alleging negligent and unskilful manner of making the examination, there is interwoven alleged malpractice, bad medical advice and treatment subsequent to the removal of the cast and examination." The charge is, to some extent, borne out by the language of the declaration, but that does not make it faulty on demurrer. No recovery would be permitted on that part of the declaration. It must be treated as a surplusage, irrelevant matter, not vitiating the declaration, but objectionable on the ground that it encumbers the record. *Utile per inutile non vitiatur.* 4 Minors Inst. 1264; St. Pl. 424.

Further assignments of error are predicated upon the rulings of the court in giving and refusing instructions and in refusing

a new trial. A resume of the evidence is necessary to an intelligent disposition of them.

The testimony of the plaintiff, aside from the particulars of his original injury and treatment of it prior to the removal of the plaster cast is, in substance, as follows: At first he refused to allow Dr. Hughes to remove the cast until he should consult his physician; Dr. Hughes insisted that it be taken off, and he finally consented; Dr. Hughes represented that the insurance company had sent him there to examine the injury and if he was not permitted to do so, the company would not allow him anything; he yielded to this thinking it best to allow the examination to be made; after the cast was taken off, Dr. Hughes told him he did not see anything the matter with the foot and to get up and walk across the floor; he attempted to do so, but could not; before its removal, he could get around with the aid of a cane; Dr. Hughes told him to go to the window, and that there was nothing the matter with his foot and in a few days he could throw his cane away; he told him he could not walk to the window and back; Dr. Hughes insisted next morning that he get up and throw away the cane and go down town; he made the examination on the 3rd or 4th of October, and on or about the 8th the foot had become so much worse that plaintiff went to see Dr. Hughes about it and told him he could not walk on it, and was directed to paint it with a solution of iodine, which was done; as the foot continued to grow worse, he told him to use crutches and finally that he did not know what to do as he had never seen a sprain turn out to be so serious; he kept going to Dr. Hughes until about the 25th of the month, when he told Hughes he saw no use in depending upon him further to which Hughes assented, and then went back to the physician who had first treated him, and who declined to have anything further to do with the case as the injury had become so serious; Dr. Hughes then advised him to go either to Baltimore to a hospital or to Dr. McGuire at Richmond; he went to Richmond and was directed by Dr. McGuire to put a plaster cast back on the foot; on his return, Dr. Hughes was requested to put it on, which he did in an imperfect manner; then Dr. Bonner was sent for, who procured a suitable bandage and put it on and it remained on the foot until in February, 1898; as the foot was then found to be in

bad condition, plaintiff went to McGuire's hospital where he was treated specially and by various methods, which resulted in some improvement, but a perfect cure was not effected and plaintiff now finds it necessary to wear steel braces to support the foot; plaintiff had received a letter from the State agent of the defendant company, dated September 7, 1897, requiring him to "call at once upon Dr. Jas. F. Hughes of Clifton Forge, Virginia, surgeon of this company that he may make an examination and report your injuries;" when Dr. Hughes came he told the plaintiff he had been sent there by the insurance company both to make an examination of the foot and to give it treatment; when the cast was taken off and the foot examined he said he thought it was getting along all right and he could see nothing the matter with it, and plaintiff thought it was getting along all right until he attempted to walk on it; he did not hesitate to make the attempt when told to do so, as he wanted to know how it was; and that plaintiff may have asked Dr. Hughes what sort of treatment he should give the foot but does not remember.

Dr. Hughes testifies substantially as follows: He is a physician and surgeon of thirty years' experience and was then, and had been for thirteen years, a surgeon of the C. & O. Ry Co.; under direction from the defendant company and another insurance company, he went on the 8th day of October, 1897, to see Tompkins and make an examination and report his condition to the insurance companies; he had been there before when Tompkins was absent from home; he found plaintiff sitting in his room with his foot and leg encased in the plaster cast, told him what his business was, explained that he came under orders from the company, and that as the plaster cast was on the foot, he could only report what he saw; plaintiff asked him if he thought the cast ought to come off, to which he replied that he did not like to take it off; plaintiff then asked if he thought it had been on long enough, and after counting up the time which was four weeks and five days, and some further conversation, plaintiff said he had first sent for witness, but as he was not at home, he had gotten Dr. Bonner to put the bandage on and he had not been there for about three weeks and plaintiff did not like that, and told witness then, that if he saw proper, to take it off, and said, "hereafter I want you to do

my practice and attend to my foot;" Dr. Hughes did not say
he would do it but took off the plaster cast, which he did not
expect to do when he went there; he saw little or no swelling,
but he did see a dark red spot on the foot which was very ten-
der, and plaintiff looked at it and said, "I think I will soon be
able to go to work again," and witness says he thought so too;
Dr. Hughes suggested to him, just merely suggested, that he
did not think it necessary to put the bandage back, and advised
him to bathe the foot in hot water two or three times a day,
rub it with the points of the fingers and subject it to passive
motion by taking hold of it and working it gently; he did not
tell plaintiff to throw away his cane and walk on his foot, but
to use his crutches and not put the foot on the ground at first;
Dr. Hughes had not then made up his mind to treat the foot,
feeling a delicacy about interfering with the case as plaintiff's
regular physician had charge of it; he did not think, from the
general appearance of the foot, that the bandage ought to be
replaced or he would have put it on; he was not acting for the
company beyond the mere matter of examination and said noth-
ing to justify a conclusion on the part of plaintiff that he was
treating him as the physician of the company; his only duty
was to visit, examine and report; after the cast was removed
plaintiff called on Dr. Hughes two or three times, and the first
time walked into the office with a stick or crutch at which wit-
ness expressed surprise and told him he ought not to walk on
the foot; these visits were for the purpose of consulting him in
relation to treatment, but no charge was made for it, as witness
was the physician for the railway company and it was his duty
as such to treat railway employees, for which he was paid by
the railway company; he had made the examination in obedi-
ence to a letter from the state agent of the insurance company
directing him to do so.

Dr. R. S. Wiley testified that, under direction from the state
agent of the defendant company he called on the plaintiff Janu-
ary 4, 1898, to make a further examination of it, when he found
it enveloped in a plaster paris cast, which the plaintiff refused
to permit him to remove under advice from Dr. McGuire and
his legal adviser; and that plaintiff told him he might remove
the cast and make the examination if he would replace it and
put the foot back in the condition in which it was, but he de-

clined to do that. He further testified that, on the 6th of February, 1898, under direction of said state agent, he went to make another examination when he found the cast had been removed, and he did so, finding the foot considerably swollen in the instep and on each side thereof.

When called in rebuttal, the plaintiff denied having made the statements attributed to him by Dr. Hughes.

Several physicians testified in the case as experts, as did also Doctors Bonner, Hunter McGuire and Stewart McGuire, who had personal connection with the treatment of the injury. All of them substantially agreed that the treatment first given the injured foot by Dr. Bonner was proper, and that the nature of the injury required the same or similar treatment.

Plaintiff in error excepted to the giving of the following instructions at the instance of the plaintiff below:

1. "The court instructs the jury that if you believe from the evidence in this case that Dr. J. F. Hughes, as the agent and representative called upon the plaintiff by reason of the provision in the insurance policy issued by the defendant to the plaintiff, authorizing the defendant to have its surgeon make such examination as he deemed proper, and that said Doctor Hughes acting under said provision, did make an examination of plaintiff's foot and ankle and that said Doctor Hughes made such examination and negligently and improperly failed to replace the plaster cast removed by him, and that such examination or failure to replace such cast, or a similar support, resulted in an injury to the plaintiff, then you should find for the plaintiff and assess his damages at what you deem proper under all the circumstances."

2. "The court instructs the jury that if you believe from the evidence in this case that the examination required in the insurance policy issued by defendant to plaintiff, comprehended and included by the practice of reasonably skilled surgeons, such an examination as would leave the injury to plaintiff's foot and ankle and the cast about such injury, in the same condition in which it was found by the defendant's surgeon, Doctor Hughes, who made such examination, and that said Doctor Hughes, as such surgeon, failed to leave said foot and ankle, and such cast and treatment therefor, in the condition he found them, and that by reason of said failure on the part of

said surgeon an injury resulted to the plaintiff, then the defendant is liable therefor."

3. "The court instructs the jury that if they find and believe from the evidence that the defendant, through its agent, acting upon his own judgment, and not at the request or at the instance of the plaintiff, removed the plaster dressing from the plaintiff's foot before the plaintiff had entirely recovered, and without replacing said dressing, or substitute therefor, directed the plaintiff to use his foot, and that the use of the foot as directed without any bandages, support or dressing, caused the injuries complained of, then the defendant is responsible for all damages sustained by the plaintiff, directly caused by the removal of the dressing and the use of the foot as aforesaid."

The clause of the policy under which the examination was made, and in connection with which the rulings of the court must be considered, reads as follows: "Any medical adviser of the company shall be allowed to examine the person, or body of the injured in respect to any injury or cause of death in such manner and at such times as he may require."

This confers upon the company a right of examination and nothing more. It also confines the authority of its agent within the same limit. That right, and the agent's authority, however, extend to the making of the examination "in such manner and at such times," as the agent may require. It confers no right to treat the injury, and the insured, was not bound to submit himself to any course of treatment at the hands of any physician, that the company might indicate. If he had bound himself to that, the obligation would have carried with it, his voluntary submission to the ordinary risk to which the law holds all persons, who submit themselves to treatment at the hands of physicians, and he could make the defendant company liable only upon such grounds as would enable him to recover damages from a physician employed by him. In such case, a physician is held to the exercise of such care, skill and diligence as are ordinarily possessed by the average of the members of the profession in good standing in similar localities, regard also being had to the state of medical science at the time. 22 Am. & Eng. Ency. Law, 2 ed. 799; *Kuhn* v. *Brownfield,* 34 W. Va. 252; *Lawson* v. *Conway,* 37 W. Va. 159.

This construction of the clause in question, which seems to

be rather acquiesced in by counsel for plaintiff in error, un-
doubtedly creates the relation of master and servant between
the defendant company and Dr. Hughes, and applies the prin-
ciple, *respondeat superior,* between the company and Tomp-
kins. "The term servant as used in this sense, is not, however,
restricted to persons engaged in *menial,* or even in domestic,
service. It is applicable to any relation in which, with refer-
ence to the matter out of which an alleged wrong has sprung,
the person sought to be charged had the right to *control* the ac-
tion of the person doing the alleged wrong; and this right to
control appears to be the conclusive test by which to deter-
mine whether the relation exists." Thomp. Neg. section 578.
There was no contractual or other relation which forbade the
absolute control of the agent in the exercise or the right of
examination, except the power of the insured to refuse to per-
mit it by surrendering his right to the indemnity due him un-
der the policy. This he was not bound to do, the reserved right
of examination being a reasonable provision, compliance with
which, in the absence of negligence, would result in no detri-
ment to anybody. He was entitled to insist upon the payment
of his indemnity, and upon the use of care and skill in the
exercise of the right of examination, if the company insisted
upon that as a condition precedent, as it was entitled to do.

Having the right to examine in such manner and at such
times as it saw fit, the company did no unauthorized act in re-
moving the plaster cast, if its removal was necessary or desir-
able in making the examination, and not injurious. As to this
there is no controversy. Nor does it seem to be disputed that,
in the absence of directions, or assent, to the contrary, on the
part of the insured, it was the duty of the company's agent to
replace the bandage. Clearly it was, for by leaving it off the
status was changed, and no right to make such change was
given by the contract. In a sense, that would have been going
entirely beyond a mere examination, and performing a work
in the nature of a treatment of the wound. The contention of
counsel for defendant in error well illustrates the importance
of this restriction. Tompkins had sought medical advice
and attention, and secured just the kind of treatment the na-
ture of the wound required, according to the opinions given
by the physicians and surgeons who testified in the case, and

had it not been disturbed, he, no doubt, would have fully re-
covered. Whether he so succeeded, by a wise choice in select-
ing the surgeon, or by mere accident, or whether it was due to
the skill of the surgeon or a chance selection of a remedy by him,
is wholly immaterial. When the company went to him to make
the examination, it found a condition, a *status*, which it had
no right to alter, and which it was bound to preserve, at the
peril of having to answer for any injury that might result
from disregard of duty in that respect, whether foreseen and
contemplated as such result or not. It is not a case of breach
of contract by non-performance. It is an act beyond, and
outside of, the contract, working injury, and intent or knowl-
edge is not a material element in such a case. "The law af-
fords a party a remedy by civil action to recover damages for
an injury to his person or property, caused either directly or
consequentially by the negligence, inadvertence, or want of
proper precaution on the part of another, although such an
injury may have been purely accidental and unintentional.
To constitute an available defence in such cases, it must ap-
pear that the injury was unavoidable, or the result of some
superior agency, without the imputation of any degree of fault
to the defendant; but the mere lawfulness of the act from which
the injury resulted is no excuse for the negligence, unskill-
fulness, or reckless incaution of the party." *Tally* v. *Ayers,*
3 Sneed (Tenn.) 677; *Cate* v. *Cate,* 44 N. H. 211; *Bruch* v.
*Carter,* 32 N. J. L. 554.

To this view and interpretation of the contract, the plaintiff
below adhered in the progress of the trial, and the circuit court,
regarded it as sufficiently supported by the terms of the con-
tract and the evidence introduced by the plaintiff, to call for
its submission to the jury, as one theory of the case, which
should govern and control them in finding a verdict, if they
should find the facts to be as contended by the plaintiff, accord-
ingly gave the three instructions above quoted, all of which
are in perfect accord with that theory, and the law as herein-
before stated.

The defendant below held to a different theory which, it
must be admitted, is partially, at least, expressed in the fol-
lowing instruction, given as instruction requested by the de-
fendant below and modified by the court:

1. "The court instructs the jury that if they believe from the evidence that the plaintiff at the time of the removal of the plaster cast from his foot, requested Dr. J. F. Hughes to treat him for his injury, and that the said Hughes, upon said request and with the consent of the plaintiff, and not at the instance and with the approval of said Hughes, removed said cast, and then gave plaintiff directions how to treat and use his said injured foot, that then the plaintiff is not entitled to recover in this action, and the jury should find for the defendant."

3. "The court instructs the jury that the principal is not responsible for the acts of its agents outside of the scope of his agency, and that all parties dealing with an agent are bound to know the scope of the agency, and if the jury believe from the evidence that the authority and power of Dr. J. F. Hughes from the defendant company was limited, to an examination of and report upon the injuries sustained by the plaintiff, and plaintiff was bound to ascertain the extent of said Huhges' authority to represent the defendant company, and in so far, if at all, he permitted any action by, or acted upon any advice of said Hughes, not embraced in said authority, he cannot for such advice or action, or for injuries resulting therfrom, recover damages from the defendant."

8. "The court instructs the jury that if they believe from the evidence that the injury complained of was the result of treatment by Dr. Hughes at the request of the plaintiff, and not at the instance and upon the advice of said Dr. Hughes, then the plaintiff cannot recover."

The first of these was modified only to the extent of inserting the words "from his foot," the words, "and not at the instance and with the approval of said Hughes," and the words, "and the jury should find for the defendant." The only modification of defendant's instruction number 3 was the striking off from the end of it the words "but that in such case, the right of action by the plaintiff, if any, is against the physician alone." Defendant's instruction No. 8, as requested, was modified by inserting the words, "and not at the instance and upon the advice of said Dr. Hughes, then," before the words, "the plaintiff cannot recover."

Defendant's instruction No. 5 was given and reads as fol-

lows: "The court instructs the jury, that if the directions of the principal to his agent are specific, to do some specific thing, and the agent disregards his specific instructions, and goes about doing something else not reasonably within the scope of the authority given, the principal will not be liable for such acts of the agent, unless they are afterwards satisfied by him."

As to the modification of instruction No. 3, there can be no cause for complaint. It remained unchanged, save only that the suggestion that plaintiff might have a right of action against Dr. Hughes was stricken out. In so doing, the court rightfully eliminated an irrelevant and immaterial issue injected, to the benefit of which the defendant was not entitled, and which could have performed no function other than to mislead and confuse the jury.

The other two modifications consisted of the insertion of the clause, "and not at the instance and upon the advice of said Dr. Hughes," and the clause, "and at the instance and with the approvel of said Hughes," which are in substance the same. In order to throw upon the plaintiff, the responsibility of the consequences of the removal of, and failure to replace, the plaster cast, was not the defendant bound to show that it had not been removed at the instance of its agent, he having actually taken it off? Plaintiff was bound to consent to its removal, if the agent demanded that it come off, for the contract required him to allow the examination *in such manner* as the agent required. Mere consent on the part of Tompkins was not enough to relieve the defendant from responsibility. It must have been a consent without a previous, or contemporaneous, demand for the removal. Consent under such demand or request was within the strict letter of the contract. Had the defendant a right to an instruction exhonorating it upon proof of less than it was bound to prove in order to be relieved? Can it complain of the action of the court in adding the omitted element of relief which the defendant was bound to establish? Complete refutation of these propositions is found in the mere statement of them. This point goes to the very root of the controversy. If the cast had been removed solely at the request of Tompkins, he would have no cause of complaint, either on account of its removal, or of the failure to replace it. It would have

been an act of his own volition. But the company had the right to take it off, and plaintiff was bound to accede to its demand, or, at least, could do so without forfeiting his right to have the examination made with requisite care and skill.

Plainly the position of the defendant in error in the court below was that Tompkins had himself, independently of the clause in the insurance policy, and without any reference thereto, employed Dr. Hughes,. or requested him to remove the plaster cast. . If the evidence established that fact, then Dr. Hughes would have been the agent of Tompkins in performing that work, or more accurately speaking, he would have been an independent contractor, employed by Tompkins. That is the gist of the argument in this Court. First, it is insisted that, under the doctrine laid down in *Kuhn* v. *Brownfield,* 34 W. Va. 252, and *Lawson* v. *Conway,* 37 W. Va. 159, governing the relation and duty of the physician to his patient, the defendant is not liable, under the evidence in the case. Next, the principle enunciated in *Pearle* v. *Street Railway Co.,* 176 Mass. 177, is invoked. That case holds that a physician who, at the solicitation of a street railway, examined a person, who, claiming to have been injured by the negligence of the company, had sued it, and, in making such examination, caused the plaintiff to try to stand on the alleged injured leg, in doing which he fell and afterwards became afflicted with hysterical trouble, as an alleged result of the examination and fall, was not an agent or servant of the railway company, but was an independent contractor, for whose negligence the railway company was not responsible.

Passing, for the present, the question whether the present case assimilates itself to the Massachusetts case, and assuming that Dr. Hughes was not an independent contractor, unless it appears that the removal of the cast was not in pursuance of his request or demand that it be taken off, the inquiry is whether the question as to whose instance it was at which the casing was removed, was fairly submitted to the jury by the instructions given for both plaintiff and defendant. If so, the court did not err in giving the instructions requested by the plaintiff nor in modifying, and giving as modified, the instructions requested by the defendant. There can be no doubt that the question was so submitted, nor that if instructions Nos. 1 and

8, asked for by the defendant, had been given without such modification, a wholly different and improper question would have been submitted, namely, whether Tompkins consented, at the instance and upon the demand of the company, and not whether he directed the removal of the cast without such request.

Ten other instructions, asked for by the defendant, were refused. The whole number requested having been fourteen.

Instruction No. 2 so refused asked that the jury be told that if, before the examination, the question of removing the cast was submitted to the plaintiff for decision, and he asked for, and received, the advice of the agent, then the physician became his agent and was not the agent of the company. It was bad because it completely ignored the evidence relating to the practically admitted fact that a virtual demand had previously been made for the removal of the bandage.

Instruction No. 6 was on the subject of agency and the extent to which an agent can bind his principal. The court was not bound to give it because its subject matter is fully covered by instruction No. 3 which was given.

Instruction No. 7 states the law, relating to the degree of care and skill due from physicians to their patients. It embodied law wholly inapplicable to the case. What Tompkins' rights were as against Dr. Hughes, is not a proper inquiry in this case, as has been shown, and its submission would have tended to confuse and mislead.

Instruction No. 9 presented a mingling and confounding of the law embodied in No. 7 with the law of agency and would have been clearly misleading.

Instruction No. 10 was to the effect that the plaintiff was not bound to allow the removal of the cast, though demanded, and that, in consenting thereto, he exercised a choice, took the risk, and so cannot complain of the consequences. The construciton given the contract entirely shuts out this contention.

Instruction Nos. 12 and 13 are to the effect that the treatment, or the giving of advice, by Dr. Hughes, was outside of his agency and no recovery can be had for injury resulting therefrom. Their subject matter is substantially embodied in instruction No. 3, which the court was not bound to repeat. That instruction distinctly told the jury that if the plaintiff had acted

upon any advice of Dr. Hughes, not embraced in his authority, he could not, for such advice or action, or for injuries resulting therefrom, recover damages from the defendant. No. 3 said, if the jury believed that the agent's authority was limited to examination, he could not recover for treatment or advice. No. 12 said the same thing in slightly different language. Defendant cannot complain of its failure to ask the court to tell the jury, as matter of law, that such advice or treatment was beyond the scope of the agent's authority. No. 13 was actually bad because its last clause embodied the principle of No. 7.

By instruction No. 14 it was proposed to inform the jury that, if Dr. Hughes took the cast off, either at plaintiff's request or by his consent, and made the examination without then and there injuring plaintiff, he was not entitled to recover. For a reason several times repeated, this instruction was bad. It ignored a previous request by the defendant. It introduces, however, another element, namely, that if the mere examination did not injure, no recovery could be had. That was a ground entirely too narrow and wholly at variance with the contention of both sides. It was not pretended by anybody that the examination itself did any injury, but that injury resulted from leaving off the plaster cast after the examination. Hence, a submission of that question could have performed no function other than to lead to a confusion and distraction of the minds of the jury from the real question in the case.

Instruction No. 11 proposed the submission of a question somewhat different from that presented by the instructions already passed upon. It was that, if Dr. Hughes, as agent of the defendant, had given the plaintiff advice and instructions, such as a surgeon or physician would sanction, and that the plaintiff negligently failed to observe such instructions and advice, and that his negligence and disobedience, in that respect, had directly contributed to his injuries, he could not recover, though the jury might believe that want of skill on the part of Dr. Hughes also contributed to the injury. The instruction was properly refused because it does not state the law. Such negligence is no bar to the action, but may be set up in mitigation of the damges. This instruction did not say that the jury should reduce the *quantum* of damages which the plaintiff would have been entitled to recover but for such negligence on his

part, as the defendant was entitled to have the jury instructed. It proposed that the court tell the jury he could not recover at all, if he had been guilty of such negligence.     See Am. & Eng. Ency Law, 2 ed. 692.

Instruction No. 4 presents a question very different from any suggested by the other instructions. It reads as follows: "The court instructs the jury that while the law makes the plaintiff a competent witness in his case, yet the jury have a right to take into consideration his situation and interest in the result of your verdict, and all the circumstances which surround him, and give to his testimony only such weight, as in your judgment, it is fairly entitled to, and in view of the interest of the plaintiff." Under some circumstances, this instruction might be proper, if broad enough to be free from the objection of giving too much prominence to the fact to which it relates. But in view of the evidence in this cause, the instruction is open to that objection. No other witness had any pecuniary interest, perhaps, in the result of the trial, but Dr. Hughes, upon whose evidence and that of the plaintiff the vital question of facts in the case turned, had an interest in this, that if any negligence should be fixed upon his company, the result would be injurious to his principal, resulting from his negligence or over zealousness, which would clearly affect him in a moral sense, at least. As the plaintiff was not the only witness interested, it would have been improper to instruct the jury to consider his interest in the controversy without directing attention to the interest of the witness on the other side of the case, upon whose testimony the defendant must win or lose. In *Insurance Company* v. *LaPointe,* 118 Ill. 384, just such an instruction as this was held bad upon the same ground.

As the case of *Pearle* v. *Street Railway Co.,* 176 Mass. 177, is relied upon as an authority controlling this case, a distinction between them is to be noted. In the Massachusetts case the court directed a verdict for the defandant. Just what the evidence was does not appear. In the opinion, it is said: "In this case the doctor was informing himself according to the suggestions of his own judgment, in order to advise and perhaps to testify for the defendant. We must assume, in the absence of other evidence than his profession and his purpose, that what he should do and how he should do it was left wholly to him."

In another place the court says: "The doctor's request that he should try standing on his left leg was not medical advice or direction upon a matter as to which the plaintiff had put himself into the doctor's hands. On the contrary, it came from one who avowedly was in an adverse interest and who had no authority of any kind." From the construction hereinbefore given to the contract, and from the evidence set out, it is equally clear that the two cases are not similar. There was no evidence tending to show that the plaintiff was under any obligation by contract or otherwise to submit himself to the examination made by the physician, nor that the physician had any right to examine him. All that was done was voluntary on the part of the plaintiff in the Massachusetts case, and not in submission to any duty he owned to the defendant.

Another case relied upon is *O'Brien* v. *Cunard S. S. Co.,* 154 Mass. 272, holding, upon the grounds that the laws required the vaccination of immigrants, and that a ship owner, who provides a competent surgeon whom the passengers may employ or as they choose, is not liable for his negligence, that a foreign steamship company is liable in an action for assault and battery, predicated upon the action of the ship's surgeon in vaccinating an immigrant steerage passenger, who made no objection to the operation. The principal of that case is manifestly distinct from the one governing the case under consideration. If the passenger was under any duty to submit to vaccination, it was a duty imposed by law. Moreover, it required a submission to treatment and surgical operation, not mere examination. If the law did not impose a duty, the court held that the evidence was such as to show that the plaintiff had voluntarily submitted to the operation and, of course, took the ordinary risk of injury, attendant upon such operations, even when the surgeon exercised the ordinary care and skill peculiar to his profession.

But one question remains, and that is whether the court, in overruling a motion for a new trial, erred. That depends upon whether the verdict is against the clear weight of evidence, as there is no error in the rulings of the court upon the trial. Only two witnesses testify as to the facts upon which the crucial question of the case turns. They are Dr. Hughes and the plaintiff. One swears positively that the plaintiff, without any

solicitation or demand that the cast be taken off, directed it to be removed. The other swears equally positively that he yielded to the demand of the company's agent. Therefore, it is simply a question as to which statement the jury ought to have accepted. Under such circumstances, there is not even a shadow of ground for saying that the verdict is against the clear preponderance of the evidence. To reverse the judgment on this ground, the court would simply be compelled to put itself in the place of the jury and say that it ought to have found the contrary of what it did find, notwithstanding the fact that evidence clearly warrants a finding either way on the question submitted.

There is no error in the judgment and it must be affirmed.

*Affirmed.*