[Sac. No. 2845. In Bank.—December 21, 1920.]

FRANK HICKMAN, Respondent, v. THE LONDON AS-
SURANCE CORPORATION (a Corporation), et al.,
Appellants.

[1] FIRE INSURANCE LAW—SUBMISSION OF INSURED TO EXAMINATION
UNDER OATH—VALID PROVISION.—A provision in a fire insurance
policy requiring the insured as often as demanded to submit to
an examination under oath touching all matters material to the
adjustment of the loss, and providing that no action on the policy
shall be sustained until full compliance with such requirement, is
a reasonable and valid stipulation.

[2] ID.—REFUSAL TO SUBMIT TO EXAMINATION—CONSTITUTIONAL IM-
MUNITY.—An insured under a fire insurance policy containing a
warranty that he will when required submit to an examination
under oath concerning matters material to the adjustment of the
loss cannot justify his refusal to submit to such an examination
on the ground that his testimony might be used against him in
a pending prosecution for arson, since the constitutional im-
munity has no application to a private examination arising out
of a contractual relationship.

[3] ID.—ACTION ON POLICY — DEFENSE OF BREACH OF WARRANTY —
SECOND DEMAND FOR EXAMINATION UNNECESSARY.—In an action
to recover on a fire insurance policy containing a warranty that
the insured would submit to an examination under oath whenever
demanded concerning all proper subjects of inquiry, it was not
necessary for the defendant, in order to avail itself of the de-
fense that the plaintiff refused to submit to such an examination
on the ground of constitutional immunity, to make a new demand
upon the plaintiff for examination after the dismissal of a pend-
ing charge of arson, since the insured was in default by his re-
fusal to submit to examination in the first instance, and the in-
surer was under no obligation to reopen the matter.

APPEAL from a judgment of the Superior Court of Kings
County. M. L. Short, Judge. Reversed.

The facts are stated in the opinion of the court.

Watt, Miller, Thornton & Watt and Miller, Thornton,
Miller & Watt, for Appellants.

Earl Rogers and H. P. Brown for Respondent.

LAWLOR, J.—The plaintiff, Frank Hickman, brought this action against the defendants, London Assurance Corporation, New Zealand Insurance Company, Limited, British & Federal Fire Underwriters of Norwich, England, Law Union & Rock Insurance Company, Limited, Yorkshire Insurance Company, Limited, Providence Washington Insurance Company, Sterling Fire Insurance Company, the Home Insurance Company of New York, and North British & Mercantile Insurance Company of London and Edinburgh, to recover for loss by fire on their respective policies. Judgment went for the plaintiff and the several defendants appeal. The record is presented in typewriting.

Prior to November 21, 1915, the said policies were issued to respondent to cover his stock of general merchandise kept and used by him in his "clothing and gents' furnishing goods store" in a two-story brick building, at 1922–1924 Mariposa Street, in the city of Fresno.

On the night of November 28, 1915, practically the entire stock of goods insured was destroyed by fire, and it is this loss which is the basis of respondent's asserted cause of action. Each of the policies was in the standard form prescribed by the legislature (Stats. 1909, p. 404) and contained a warranty that gasoline or benzine in excess of one quart would not be kept, used, or allowed on the premises. To the allegation of the complaint that the fire originated from causes unknown, the defendants set up in their answer that the fire was started with the knowledge, connivance, and design of the respondent, and that in violation of the above warranty gasoline in excess of one quart was kept, used, and allowed on the premises.

In the employ of respondent at the time of the fire, and for some years previously, was W. H. Jenks, who testified in detail that in July, 1915, a portion of respondent's stock was destroyed, and that the latter was dissatisfied with the settlement made by him with the companies then carrying his insurance; that thereafter the policies in suit were issued; that respondent had planned with him "to have the stock totally destroyed," and had told him to bring oil and gasoline upon the premises "and make all the arrangements for burning the store"; that between the 5th and the 15th of October he purchased five gallons of gasoline in a tin container, which he placed in the basement of the store, and told

respondent of this; that subsequently respondent gave him "a gallon jug and a black grip or hand-bag," in which he brought five or more gallons of kerosene and a number of gallons of gasoline into the store; that prior to November 28th he distributed gasoline around the basement, in vessels, and used shavings and different articles to absorb it, so that by seepage the gasoline would be ignited by the gas "pilot lights"; that about 4 or 5 o'clock on the afternoon of November 28th he raised a trap-door in the basement, so that the draught thereby created would cause the gasoline to ignite, and went home, where he remained until notified by telephone that evening there was a fire in the store, and that thereupon, pursuant to the instructions of respondent, who had gone to San Francisco "to throw off all suspicion from him," he sent in his own name the following telegram to respondent: "Frank Hickman, care Washington Hotel, San Francisco. Don't buy more goods. Your store is burning."

The respondent testified that he went to San Francisco "to visit the Fair," and admitted having received the telegram while there, but denied that he induced Jenks to burn the property, or that he had any knowledge that it was to be done; that he had ever spoken to Jenks about burning the store or bringing gasoline or oil on the premises, or that he knew of any gasoline or oil being on the premises.

On December 2, 1915, a complaint was sworn to by J. G. Goehring, chief of police of Fresno, and filed on the following day, charging respondent and Jenks with the crime of arson alleged to have been committed in the burning of the store. December 22d they were held to answer. The district attorney filed an information on December 31st, upon which the accused were arraigned January 8, 1916, when respondent was released on bail. An amended information was filed January 13th. February 14th respondent pleaded not guilty. The trial opened on April 18th, and on April 24th, while it was still in progress, the district attorney moved the court for an order dismissing the information on the ground "that the people have not sufficient evidence on which to warrant a conviction." The motion was granted, the information dismissed, and the bail exonerated.

On May 22d Jenks pleaded guilty and applied for probation. The application was referred to the probation officer, who reported on June 9th, recommending that probation be

denied, and it was so ordered. Jenks thereupon withdrew his plea of guilty and pleaded not guilty. He was tried, convicted on October 11, 1916, and released on probation for the term of five years.

This action was commenced on February 27, 1917. The cause was tried by the court sitting without a jury. It was found in effect that Jenks set fire to the store and that at the time he was insane; that the gasoline was carried upon the premises by him, without the knowledge or connivance of respondent, that respondent did not know there was any gasoline in the store, and that the fire occurred without any complicity on his part.

Each of the policies also contained the following warranty: "the insured shall exhibit to any person designated in writing by this company all that remains of any property herein described and shall submit to examination under oath, as often as required, by any such person, and subscribe to the testimony so given, and shall produce to such person for examination, all books of account, bills, invoices and other vouchers, and permit extracts and copies thereof to be made . . . No suit or action on this policy for the recovery of any claim shall be sustained until full compliance by the insured with all of the foregoing requirements."

On February 5th appellants made a written demand upon respondent that he appear before Leon Levy, a notary public, on February 11th, and, pursuant to the above warranty, submit to examination and produce "all original invoices, bills, and vouchers of goods . . . claimed by him to have been damaged or destroyed, . . . and all books of account pertaining to the business." On the last-mentioned date the hearing was continued by consent to the following day, when respondent appeared. The following took place: Respondent's counsel read into the record of the proceedings each of the letters in which the respective appellants had designated H. M. Farrar as their representative or adjuster "in any matters pertaining to the loss." Respondent was then sworn and this colloquy ensued: "Farrar: Q. Your name in full? A. Frank Hickman. Q. Your age? A. Forty-four. Q. Your residence? A. 430 Neilson Avenue. Q. Business location? A. 1922 Mariposa. Q. How long have you been in your present business location? . . . A. I refuse to answer on the advice of counsel. Q. Now, Mr. Hickman, you refuse to an-

swer any more questions? A. For the same reason, at this time." Thereupon respondent served and filed "a written statement" to the effect that he had been accused of arson and was about to be tried upon that charge; "that any material testimony which he might give at said examination would relate either to the amount, value, cost of or extent of damage to the goods . . . or to the cause of the fire, . . . both of which questions are at issue in said criminal proceeding"; that the criminal charge had been initiated and was being prosecuted by H. M. Farrar, appellants' adjuster; that he, respondent, had been advised by counsel that any testimony given by him at any examination could and would be used against him on his trial for arson; that, by virtue of article I, section 13, of the constitution, he refused to submit to examination or to produce any books or papers at that time; that he was ready "to stipulate and agree that he will" submit to examination "immediately after the conclusion of the said criminal prosecution and immediately after the trial of said cause and verdict and judgment therein"; and that if appellants or Farrar would cause the arson charge to be dismissed he would submit to examination at any time. In reply the following statement was made by Farrar: "The insurance companies . . . refuse to accept Mr. Hickman's offer . . . and further demand that he now submit to examination and furnish the books, bills, invoices, etc., heretofore demanded." Whereupon respondent said: "I stand by my reasons given this morning and the course adopted this morning." No other demand by appellants or offer by respondent to submit to examination and produce the required books and papers was made at any time.

The court found "that the examination of said plaintiff at said time [February 12th] . . . would have had for its purpose inquiry into matters necessarily involved in a criminal prosecution; . . . that the course and conduct of said plaintiff in the matter of said hearing . . . was proper and right, and that he was justified in said course and conduct; that the plaintiff did comply with all . . . the terms and conditions of said policies; . . . and that he was justified in refusing to submit to an examination under oath at said time when said information and trial were pending."

The court justified respondent's refusal solely on the ground of his claim of privilege.

Appellants contend that respondent cannot recover because he "refused to submit to examination under oath, or to permit his books, or vouchers, or bills, or other papers concerning the property . . . to be inspected by the defendants herein, which refusal was in violation of the provisions of said policies"; further, "that the excuse given by plaintiff . . . has no merit, for the reason that in . . . section 1324 of the Penal Code it is expressly declared that no information which might be obtained from him on his examination . . . could be used against him in any criminal proceedings"; and that "the provision of the policies . . . is equivalent to a positive unconditional promise on the part of plaintiff that he will comply therewith, irrespective of how such compliance may affect him, and . . . his refusal would constitute such a violation . . . of the provision as would preclude him from instituting any action thereon."

Respondent's claim of privilege is thus stated in his brief: "A defendant on trial for his liberty has the right to refuse to submit to a private inquisition." It is a fact, as already appears, that two days after respondent's refusal issue was joined on the criminal charge and thereafter until April 24th it was pending against him.

[1] The validity of provisions of the character here under consideration has been frequently upheld. (*Gross* v. *St. Paul Fire & Marine Ins. Co.*, 22 Fed. 74; *Fleisch* v. *Insurance Co. of North America*, 58 Mo. App. 596; *Firemen's Fund Ins. Co.* v. *Sims*, 115 Ga. 939, [42 S. E. 269]; *Pearlstine* v. *Westchester Fire Ins. Co.*, 70 S. C. 75, [49 S. E. 4]; *Southern Home Ins. Co.* v. *Putnal*, 57 Fla. 199, [49 South. 922]; *Liverpool L. & G. Ins. Co.* v. *Cargill*, 44 Okl. 735, [145 Pac. 1134]; *National Fire Ins. Co.* v. *Humphreys* (Tex. Civ.), 211 S. W. 811; Richards on Insurance Law, 3d ed., 416; 1 Clement on Fire Insurance, 251; 5 Joyce on Insurance, sec. 3330; 19 Cyc. 853; 4 Cooley's Briefs on Insurance, 3395.)

This rule is thus expressed in 13 Am. & Eng. Ency. of Law, 358: "As the facts with respect to the amount and circumstances of a loss are almost entirely within the sole knowledge of the insured, and the opportunity and temptation to perpetrate a fraud upon the insurer is often great, it is necessary that it have some means of cross-examining, as it were, upon the written statement and proofs of the

insured, for the purpose of getting at the exact facts before paying the sum claimed of it. Such considerations justify the provision universally to be met with in policies, requiring the insured as often as demanded to submit to an examination under oath touching all matters material to the adjustment of the loss, and provisions of that character are held to be reasonable and valid.''

And in Ostrander on Fire Insurance, second edition, section 172, it is said: ''The right to require the insured to submit to an examination under oath concerning all proper subjects of inquiry is clearly stipulated for in the form of policies now in general use. The intent of this provision is to prevent fraudulent concealment, and to enable the insurer to obtain material information in regard to the origin and circumstances of the fire, the value of the property, and the claimant's interest therein. The requirement is a reasonable one, and will often, no doubt, be useful in securing important and truthful disclosures that would otherwise be withheld, to the injury of the insurer. When the insured refuses to be examined under oath, he will forfeit all right to recover.''

In *Connecticut Fire Ins. Co.* v. *George,* 52 Okl. 432, [153 Pac. 116], the court said that ''There may be logic in plaintiff's argument that defendant was not conducting the examination in good faith, but the fact still remains that defendant was acting within the terms of an expressed stipulation found in the policy, which gave it the right to demand such an examination, and it is not for the insured to inquire into the motive actuating the company in exacting the examination, but on his part to comply therewith and to answer all material questions, notwithstanding he may believe that the principal object of the company is to find some loophole whereby it might evade payment of the policy.

It was in *Bonner* v. *Home Ins. Co.,* 13 Wis. 758, 771, that the court, speaking through Mr. Chief Justice Dixon, said: ''This action should have been dismissed because prematurely commenced; for, until examination was had, the losses were not, by the terms of the policies, due and payable.''

And it was said in *Wheeler* v. *Connecticut Ins. Co.,* 82 N. Y. 543, [37 Am. Rep. 594], citing *Beebe* v. *Johnson,* 19 Wend. 500, that ''to excuse nonperformance it must appear that the act to be done could not by any means have been accomplished.''

It is to be noted that under the policies a loss was not payable until ninety days after the receipt by appellants of respondent's preliminary proofs of loss, and that no action on the policies should be sustained "unless begun within fifteen months next after the commencement of the fire." The latter period would have expired on February 28, 1917, and the action, as we have stated, was commenced the day before.

No case has been cited, and we are aware of none, where the constitutional immunity of an insured was urged as a ground for refusing to submit to examination, or to produce books and papers. *Counselman* v. *Hitchcock,* 142 U. S. 547, [35 L. Ed. 1110, 12 Sup. Ct. Rep. 195, see, also, Rose's U. S. Notes], and *Ex parte Clarke,* 103 Cal. 352, [37 Pac. 230], however, are cited by respondent in support of his failure to comply with the demand. In the first of these cases Counselman had been subpoenaed to appear before a federal grand jury and give testimony concerning certain alleged violations of the Interstate Commerce Act (24 Stat. 379). He refused to testify on the ground that any testimony he might give could be made the basis for a criminal prosecution against him under said act. Upon his continued refusal to testify he was committed for contempt and he sued out a writ of *habeas corpus.* The supreme court, in discharging the petitioner, said: "It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. . . . It is an ancient principle of the law of evidence that a witness shall not be compelled, *in any proceeding,* to make disclosures or to give testimony which will tend to criminate him or subject him to fines, penalties or forfeitures." (Italics ours.)

The Clarke case was also a proceeding in *habeas corpus.* The petitioner had been adjudicated an insolvent, and he was cited to appear before the superior court to be examined concerning his assignee's charge that he had fraudulently concealed property which should have been turned over to such

assignee for the benefit of his creditors. Clark declined to testify "upon the ground that his answers might be made the foundation of a criminal action against him." He was committed for contempt, and in discharging him from custody this court, speaking through the late Chief Justice Beatty, said: "To bring a person within the immunity of the constitutional provision, it is not necessary that the examination should be attempted in a criminal prosecution against the witness, or that such a prosecution should have been commenced and actually pending. It is sufficient if there is a law creating the offense under which the witness may be prosecuted. If there is such a law under which the witness may be indicted, or otherwise prosecuted, for a public offense arising out of the acts to which the examination relates, he cannot be compelled to answer in any collateral proceeding unless the law absolutely secures him against any use in a criminal prosecution of the evidence he may give," and the court followed *Counselman* v. *Hitchcock, supra.*

[2] But those and other authorities of similar import refer only to the attempted compulsion of a witness in a trial, either civil or criminal, a hearing or other lawful inquiry of a public nature. The compulsion secured against by the constitution is a compulsion exercised by the state in its sovereign capacity in some manner known to the law. Constitutional immunity has no application to a private examination arising out of a contractual relationship. The examination to which appellants demanded respondent should submit was an extrajudicial proceeding, not authorized by any constitutional or statutory provision, but purely by virtue of a contract between the parties. To bring a case within the constitutional immunity, it must appear that compulsion was sought under public process of some kind. This being so, respondent's refusal to undergo examination and produce his books and papers acquires no sanctity because he urged his constitutional right not to be compelled to be a witness against himself. The demand was made upon him by virtue of the stipulation in the contract and by the stipulation alone must his refusal be judged. The stipulation constituted a promissory warranty under which appellants had the right to demand compliance by respondent "as often as required," and the performance of such stipulation was a condition precedent to any right of action. No question was

raised as to the sufficiency of the demand, or, aside from the claim of privilege, as to the reasonableness of the time and place designated in the demand. The obligation to perform the warranty was as binding on respondent as his obligation to pay the premiums on the policies. The respondent did not fulfill his obligation, and stands here as having recovered a judgment upon an express contract one of the conditions of which he has failed to perform. In other words, when he commenced this suit he was without a cause of action.

Respondent cites certain cases holding that the right to demand the performance of the condition precedent must be exercised in a reasonable manner. Thus, in *Thomas* v. *Burlington Ins. Co.*, 47 Mo. App. 169, and *Gordon* v. *St. Paul Fire & M. Ins. Co.*, 197 Mich. 226, [L. R. A. 1918E, 402, 163 N. W. 956], it was held under a similar stipulation that the insured was justified in insisting that his counsel be present at his examination and in refusing to be examined unless he were permitted to be present. In *Phillips* v. *Protection Ins. Co.*, 14 Mo. 220, the court declared that the prevalence of a cholera epidemic at the place designated excused the nonattendance of the insured. Under a stipulation to submit to examination as often as required and a special promise to reappear after the original examination, which the insured after notice failed to do, it was held in *Porter* v. *Traders' Ins. Co.*, 164 N. Y. 504, [52 L. R. A. 424, 58 N. E. 641], that because he was sufficiently examined at the first hearing the insured was not in default. In all of these cases, however, the question was merely as to the reasonableness of the time, place, or mode of examination. No objection to the examination on any such ground was made here.

[3] Respondent's offer of February 12th, as we have seen, is twofold—an offer to comply with the demand after the charge of arson was dismissed, or at *any* time if appellants would cause such charge to be dismissed. The point is made that in view of this offer, which was a part of the respondent's refusal to submit to examination, the appellants, after the dismissal of the charge of arson, should have made a new demand upon the respondent for his examination, and that such demand not having been made, he was not in default. But the respondent was already in default, as he had no right to refuse on the ground stated to submit to examination in the first instance. It may be that if he himself had

made an offer, after the criminal charge against him had been dismissed, to then and there submit to an examination, and such offer had been refused, his default would have been removed. But he did not so offer, and, since he was in default, the appellants were under no obligation themselves to reopen the matter.

It may be conceded that the position in which respondent found himself between February 12th and April 24th was one of difficulty, but it was a difficulty created by the contract he made. It has been said that "Mere hardship or difficulty will not excuse a party from carrying out a contract; and, where one contracts to do any act which is possible, he is liable for a breach, even though circumstances arise, without his fault, making it difficult, or even impossible, for him to perform. (*Walker* v. *Tucker,* 70 Ill. 527; *Ballance* v. *Vanuxem,* 191 Ill. 319, [61 N. E. 85]; *Lake Shore & M. S. R. Co.* v. *Richards,* 152 Ill. 59, [30 L. R. A. 33, 38 N. E. 773].) The breach of this contract by appellants relieved the other parties from performance on their part. (7 Am. & Eng. Ency. of Law, 2d ed., p. 150, and cases there cited.)" (*Ptacek* v. *Pisa,* 231 Ill. 522, [14 L. R. A. (N. S.) 537, 83 N. E. 221].) And it was declared in *Bastian* v. *British American etc. Co.,* 143 Cal. 287, [66 L. R. A. 255, 77 Pac. 63]: "If the insured cannot bring himself within the terms and conditions of the policy he cannot recover. The terms of the policy constitute the measure of the insurer's liability. If it appears that the contract has been violated, and thus terminated by the assured, he cannot recover. He seeks to recover by reason of a contract, and he must show that he has complied with such contract on his part." (See, also, *Smoot's Case,* 15 Wall. (U. S.) 36, [21 L. Ed. 107, see, also, Rose's U. S. Notes].)

It follows that the conclusion of law that respondent's refusal to submit to examination and produce his books and papers on the ground of his constitutional immunity was "justified . . . proper and right" is erroneous, and that upon the findings of fact as to his refusal judgment should have gone for the appellants. This renders it unnecessary to consider appellants' other contentions—that the evidence is not sufficient to support either the finding that respondent was not implicated in causing the fire, or the finding that the gasoline was brought on the premises without his knowledge

or consent; or to pass on their assignments of error to numerous rulings on evidence.

The judgment is reversed and the cause remanded, with directions to the court below to enter judgment in favor of the defendants.

Shaw, J., Wilbur, J., Lennon, J., Olney, J., Sloane, J., and Angellotti, C. J., concurred.