[Sac. No. 5473. In Bank. Feb. 3, 1942.]

MARTIN ERRECA, Respondent, v. WESTERN STATES LIFE INSURANCE COMPANY (a Corporation) et al., Appellants.

C. Ray Robinson, Downey, Brand & Seymour, Frederic R. Pierce and M. M. Doyle for Appellants.

Pillsbury, Madison & Sutro, Marshall P. Madison, Eugene M. Prince, M. D. L. Fuller, James W. Archer, F. Eldred Boland, Knight, Boland & Riordan, Livingston & Livingston, McCutchen, Olney, Mannon & Greene, F. V. Keesling and Keesling, Wayland & Eliot, as Amici Curiae, on behalf of Appellants.

D. Oliver Germino, George G. Murry and F. M. Ostrander for Respondent.

EDMONDS, J.—Martin Erreca, the respondent, holds a policy of life insurance, which includes provisions for disability benefits, issued to him by Western States Life Insurance Company, the obligations of which have been assumed by California-Western States Life Insurance Company. These companies have appealed from a judgment against them for $2,300, asserting that he has not been disabled within the meaning of the contract.

Under the terms of the policy, the respondent, in the event of his total and permanent disability prior to his sixtieth birthday, is entitled to the sum of $200 a month for one year, and the sum of $100 a month thereafter during the continuance of such disability. Total disability is defined to mean "whenever the insured becomes wholly disabled by bodily injury or disease so that he is prevented thereby from engaging in any occupation, or performing any work whatsoever for remuneration or profit. . . ." In his application for insurance, respondent stated that his occupation is "farmer engaged in grain and stock."

The policy was written in 1923. On February 2, 1938, respondent was thrown from a horse and sustained a multiple fracture of his right leg. Several ligaments of the knee were also torn. He was taken to the hospital where he was required to remain for almost two months. During his stay there he suffered a pulmonary embolism, better known as a blood clot in the lung. Upon his release from the hospital, he returned to his home where he remained in bed for several weeks. Thereafter, he required crutches for several weeks. During this period, varicose veins appeared in his leg. Open lesions and ruptured varicose ulcers developed, requiring him to keep his legs constantly bandaged. At the time of the trial, his fracture had completely healed, but there was a permanent instability in his knee. He is able to walk with the use of a cane but, according to his testimony, only to a limited extent. He testified that, because of the varicose veins and ulcers, any extended walking brings about a swelling in his legs, causing him extreme pain. There is evidence that as a result of this forced inactivity, his weight has increased from 200 to 240 pounds, and he suffers a shortness of breath and quick heart action.

Upon his discharge from the hospital, the respondent filed with the California-Western States Life Insurance Company, which will be referred to as the insurer, proofs of his dis-

ability upon which payments were made for five months. On October 26, 1938, the company notified him that, according to the report of his physician his disability was partial only and not such as "wholly prevents you from carrying on any work whatsoever for remuneration or profit," and that it would make no further payments to him. The respondent then commenced this suit, seeking to recover disability benefits from October 2, 1938, to and including January 2, 1940. His right to them depends upon whether he has sustained injuries which bring him within the terms of the policy and he has complied with its terms.

Resolving all of the conflicting testimony in favor of the respondent, the facts concerning his business affairs and his physical condition, as of the time of the trial, may be fairly summarized as follows: When the accident occurred, he was a man 58 years of age who during his entire active lifetime has engaged in grain and stock farming. He owns, leases and personally operates grain ranches in Merced County containing an aggregate area of 7,000 acres. He also owns a dairy ranch which is managed by a partner and from which he derives an income of $150 a week. Prior to the accident, he enjoyed good health and was in excellent physical condition.

In his "Preliminary Notice of Disability" he stated that his principal duties, before his injury, were "supervisory." However, that is a very general classification of activities which covered a wide range.

As a ranch executive, he negotiated and made leases of land. In connection with his farm operations he made annual arrangements for crop financing, signed notes and mortgages, and bought livestock and supplies. Requiring even more experience and judgment, he determined the time for the planting, harvesting and selling of his crops.

He also acted as a ranch superintendent and personally managed and supervised the farm work. He directed the plowing of his land and the planting, cultivating, irrigating and harvesting of the crops. To properly supervise these operations, he was compelled to engage in activities requiring physical exertion. For example, in order to determine whether the land was ready for planting, he would walk over it and by means of a digging instrument, test the ground for moisture. He followed behind the plows on foot to see that the proper depth was attained. During planting, he directed the even distribution of seed by walking over the land and in-

specting it behind the seeder. He would then dig in the land to see how deeply the seed was penetrating. To ascertain whether the grain was ready for harvesting, he would make an examination of the land; and after harvesting commenced, he walked behind the harvester to see that the grain was being properly threshed. In directing the performance of the work, he rode horseback; at times he traveled to the more remote ranches in an automobile.

But he did manual labor also. He operated plows, drove tractors, repaired fences, buildings and farm machinery. The evidence shows that, at times, he aided in the construction of levees and ditches. Unquestionably he has been a farmer who not only overlooked no detail in the conduct of his operations but also worked with his men when the occasion required.

Since his injury, he can stand upon his feet for brief periods only. Although he can take short walks around the yard, he must use a cane. The circulation in his leg has been so obstructed that his leg is "half-dead," and he has frequently been confined to bed. He can no longer ride a horse.

In his present condition, he can perform no manual labor whatsoever. He is unable to walk over plowed ground, or to bend down upon his hands and knees and examine the soil. He cannot direct the plowing, planting, cultivating or harvesting of his land as he did before. He is able to drive an automobile and frequently rides to his farms, but he cannot approach the scene of the farm work, inspect the land, and directly superintend the conduct of the farming. In short, he can engage in no activity requiring any form of physical exertion. However, the accident has in no way impaired his mental faculties. He is able to negotiate leases, arrange finances for crops, buy supplies, and participate in the selling of his grain. Respondent's physician, Doctor Hillyer, testified that in his opinion respondent "could perform all the secretarial work connected with the farm."

As a result of his disability, respondent has abandoned his management and control of his ranches to his son who is now acting as the sole overseer. Occasionally, he has conferred with his son regarding certain transactions incident to the operation of the farms, such as the kind of crops to be planted and the time and price for the selling of such crops. He has participated in the negotiation of certain leases, has signed notes, negotiated loans, talked to grain buyers, and has attended to the buying of hogs. The actual conduct and control

of farm operations, however, has been completely left in the hands of his son.

Upon this evidence, the trial court found that the respondent, as of the date of trial, was totally and permanently disabled within the meaning of the policy. Both insurance companies challenge that finding as unsupported by the evidence. They also contend that respondent waived any right to disability payments by refusing to submit to a medical examination as required by the policy.

Much confusion is found in the authorities because of the failure of courts to distinguish between policies which insure against general or non-occupational disability and those which provide benefits for occupational disability. Under the latter type of policy, the coverage is limited to the duties of a particular occupation, and the insured is protected as a particular workman. Notwithstanding his ability to perform the work of other occupations, he is entitled to disability benefits upon proof that he is totally and permanently disabled from transacting the duties pertaining to a defined occupation, generally the employment in which he was engaged at the time the policy was written. Typical of the phraseology used in this type of policy are the words "total disability exists where the injuries disable the insured from performing any and every kind of duty pertaining to his occupation." Because the risk insured against by the occupational disability policy is specific, the premium is ordinarily high.

On the other hand, a non-occupational or general disability policy of insurance indemnifies against total and permanent disability which prevents the insured from performing the work of any occupation. He is insured as a man, not as a particular workman, and may recover only upon proof that he is disabled from engaging in any gainful occupation or work. This type of coverage is usually included as an adjunct to life insurance entitling the insured to waiver of premiums and to benefit payments in the event of his total disability. Since the risk is incidental to the life policy and is comparatively remote, the premium is ordinarily low. As contrasted with the wording of an occupational clause, a general disability clause defines total disability to mean "whenever the insured is wholly incapacitated from performing any work whatsoever for remuneration or profit."

Courts have not been in entire agreement as to the construction to be accorded the general disability clause. Some have

refused to differentiate such insurance from the occupational type and permit the insured to recover disability benefits whenever he becomes wholly disabled from engaging in the vocation which he was following at the time of the accident even though there be other lines of employment in which he is qualified to engage unhampered by his disability. (*Foglesong* v. *Modern Brotherhood*, 121 Mo. App. 548 [97 S. W. 240] ; *Equitable Life Assur. Soc.* v. *Merlock*, 253 Ky. 189 [69 S. W. (2d) 12] ; *Metropolitan Life Ins. Co.* v. *Blue*, 222 Ala. 665 [133 So. 707; 79 A. L. R. 852] ; *Neill* v. *Order of United Friends*, 149 N. Y. 430 [44 N. E. 145, 52 Am. St. Rep. 738] ; 24 A. L. R. 203, 206-209; 79 A. L. R. 857, 862-865; 98 A. L. R. 789, 798-803.) The effect of these decisions is to enlarge the insurer's liability to that which it assumes under a non-occupational policy.

Other decisions are based upon a strict and literal construction of the policy in which little regard is had for the capabilities and qualifications of the insured, and he is permitted to recover only upon proof that he is physically disabled from engaging in any employment for wage or profit (*Garms* v. *Travelers' Ins. Co.*, 242 App. Div. 230 [273 N. Y. Supp. 39] ; *Cooper* v. *Metropolitan Life Ins. Co.*, 317 Pa. 405 [177 Atl. 43] ; see cases collected in A. L. R. notes cited above). But some courts, including those of California, recognizing the harshness of this rule, have chosen a qualified or intermediate position. They have held that total disability exists, within the meaning of the term "any occupation" as contained in a general disability clause, whenever the insured is incapacitated from following any substantial or remunerative occupation for which he is fitted or qualified, mentally or physically, and by which he is able to earn a livelihood (*Wright* v. *Prudential Ins. Co.*, 27 Cal. App. (2d) 195 [80 Pac. (2d) 752] ; *Hill* v. *New York Life Ins. Co.*, 38 Cal. App. (2d) 627 [101 Pac. (2d) 752] ; *Prudential Ins. Co.* v. *Harris*, 254 Ky. 23 [70 S. W. (2d) 949] ; *Prudential Ins. Co.* v. *South*, 179 Ga. 653 [177 S. E. 499; 98 A. L. R. 781] ; *Nickolopulos* v. *Equitable Life Assur. Soc.*, 113 N. J. L. 450 [174 Atl. 759] ; *Waldman* v. *Mutual Life Ins. Co.*, 252 App. Div. 448 [299 N. Y. Supp. 490] ; 98 A. L. R. 789, 798-803). "The authorities supporting this rule define total disability which prevents the insured from engaging in any occupation or performing any work for compensation as a disability which prevents his working with reasonable continuity in his customary

occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity.'' (*Hurwit* v. *Prudential Ins. Co. of America,* 45 Cal. App. (2d) 74 [113 Pac. (2d) 691].)

This construction of the words ''any occupation'' is based upon the theory that it is unreasonable to deprive an uneducated laborer, disabled from performing any manual work, of the benefits of his policy, because he might, notwithstanding those disabilities, with training and study, pursue a profession at some future date, or become an accountant or a banker. And it would be equally unreasonable to hold that a doctor, lawyer, or business executive is not totally disabled from engaging in ''any occupation'' or from performing ''any work'' because he is able to run a news stand or work as a day laborer.

Moreover, unlike the liberal interpretation which arbitrarily and unqualifiedly defines the term ''any occupation'' to mean the usual employment of the insured, this intermediate view does not impose upon the insurer a liability which it did not agree to assume. The insurer may reasonably be said to have contemplated that the insured would be totally disabled within the meaning of the policy if he were wholly incapacitated from conducting his ordinary employment, or such other employment as he might fairly be expected to follow in view of his station in life and his circumstances and capabilities. Under this construction, ''any occupation'' may mean the insured's usual occupation only if he is for any reason unfit to perform the duties pertaining to any other type of business or employment.

The policy of insurance issued to respondent is clearly a non-occupational policy. He is not insured as a farmer or farm operator, for the disability clause explicitly conditions appellants' liability upon a total disability which prevents him ''from engaging in any occupation, or performing any work whatsoever for remuneration or profit. . . .'' Nevertheless, and although respondent is a shrewd farm executive and a successful grain operator, the testimony discloses that he has had little formal education and is neither trained nor qualified for any other occupation. And because of his age and experience in life, he probably could not prepare himself for other remunerative employment. Accordingly, the respondent must be deemed to be totally disabled if he is no longer able to pursue the occupation of farmer or farm super-

visor. The insurer has in fact treated the issue as such in its briefs.

According to overwhelming authority, the term "total disability" does not signify an absolute state of helplessness but means such a disability as renders the insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way. Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business (*Fitzgerald* v. *Globe Indemnity Co.*, 84 Cal. App. 689 [258 Pac. 458]; *Wright* v. *Prudential Ins. Co., supra*; *Hill* v. *New York Life Ins. Co.*, 38 Cal. App. (2d) 627 [101 Pac. (2d) 752]; *Hurwit* v. *Prudential Ins. Co., supra*; *Aetna Life Ins. Co.* v. *Phifer*, 160 Ark. 98 [254 S. W. 335]; *Sherman* v. *Continental Casualty Co.*, 103 Cal. App. 518 [284 Pac. 946]; *Lobdill* v. *Laboring M. M. Aid Assoc.*, 69 Minn. 14 [71 N. W. 696, 65 Am. St. Rep. 542, 38 L. R. A. 537]; *Young* v. *Travelers' Ins. Co.*, 80 Me. 244 [13 Atl. 896]; *Prudential Life Ins. Co.* v. *South, supra*; 24 A. L. R. 203; 79 A. L. R. 857; 98 A. L. R. 789; Couch, Cyclopedia of Insurance Law, vol. 7, sec. 1670). Conversely, the insured is not totally disabled if he is physically and mentally capable of performing a substantial portion of the work connected with his employment. He is not entitled to benefits because he is rendered unable to transact one or more of the duties incidental to his business (*Dietlin* v. *Missouri State Life Ins. Co.*, 126 Cal. App. 15 [14 Pac. (2d) 331, 15 Pac. (2d) 188]; *Dietlin* v. *General American Life Ins. Co.*, 4 Cal. (2d) 336 [49 Pac. (2d) 590]; *Martin* v. *Postal Union Life Ins. Co.*, 31 Cal. App. (2d) 329 [87 Pac. (2d) 897].)

Applying these principles to the case at bar, the evidence amply supports the finding of the trial court that the respondent, as of the time of trial, is totally and permanently disabled. Admittedly, he can no longer do manual labor of any sort. Nor can he supervise and manage farm operations as he did before. There is evidence, consisting of the testimony of another farm operator, that successful grain farming cannot be properly conducted by the farmer from the doorstep of his home or from his automobile, but on the contrary, requires his personal direction at the scene of the farm work. Because of respondent's inability to walk over plowed or wet ground, or to bend down upon his hands and knees, he can

no longer inspect his land nor supervise the many indispensable farm operations in progress, such as the plowing, planting, cultivating and harvesting. The insurer lays great emphasis upon the respondent's frequent trips to his ranches in his automobile, but the record does not show any accomplishments by these visits other than the satisfaction of his curiosity as owner or lessor. Furthermore, the evidence shows that the fields are not accessible to an automobile and the respondent therefore cannot approach the scene of farm operations and properly supervise the work in the required manner as above described. Secretarial work in connection with farm operations is unimportant.

The insurer also stresses the magnitude of the respondent's enterprise and his income therefrom. Such matters have no proper place in the determination of whether respondent is totally disabled from performing remunerative work. Disability insurance is designed to provide a substitute for earnings when, because of bodily injury or disease, the insured is deprived of the capacity to earn his living. (*Martin* v. *Postal Union Life Ins. Co., supra.*) It does not insure against loss of income. The respondent receives his income from his ranches as an owner or lessor; his labor contributes nothing toward it. The contention of the insurer would lead to the strange conclusion that a bedridden merchant is not totally disabled from performing gainful work because he receives a substantial income from a business, the management of which he has been forced to abandon to others.

True, since his injury, the respondent has negotiated loans and leases, signed notes and mortgages, talked with grain buyers, participated in the buying of supplies, and occasionally talked with his son concerning farm operations. Although such activities are neither trivial nor inconsequential, they are the type of duties that are infrequently and intermittently performed and cannot be said to constitute the substantial and material acts of the occupation of farming. In its final analysis, the question of what amounts to total disability is one of fact. (*Sherman* v. *Continental Casualty Co., supra; Ives* v. *Prudential Ins. Co.,* 12 Cal. App. (2d) 306 [55 Pac. (2d) 273]), and where, as here, the finding of the trial court is supported by substantial evidence, it will not be disturbed upon appeal.

The authorities relied upon by appellants are factually

distinguishable from the instant case. In *Dietlin* v. *Missouri State Life Ins. Co., supra,* the insured, a plastering contractor, fell from a scaffolding and permanently injured his foot. After the accident, the insured was able to perform every duty pertaining to his occupation except that he was unable to climb scaffolds and ladders. The principal duties of his occupation, as described in his application for insurance, consisted of "Office, Estimating and Supervising Duties." In denying recovery of benefits for total disability, the court reasoned that the climbing of scaffolds did not constitute a substantial portion of his duties. Unlike respondent, he was still able to perform the managerial and supervisorial activities connected with his business.

In *Missouri State Life Ins. Co.* v. *Snow,* 185 Ark. 335 [47 S. W. (2d) 600], the insured was a farm operator who suffered a hip injury which disabled him from performing manual labor. He farmed through tenants, however, and his injury in no way prevented him from supervising farm operations. Moreover, he conducted a country store, waited upon customers, purchased goods and attended to all material acts essential to the prosecution of a mercantile business. The insured in *Aetna Life Ins. Co.* v. *Person,* 188 Ark. 864 [67 S. W. (2d) 1007], was a farm operator, who contracted an arrested case of tuberculosis. Despite his ailment, he was able to manage his various farms in his usual and customary manner. Furthermore, the evidence showed him to be a highly educated man who, during the period in which he was assertedly disabled, secured a license to practice law and actually participated in the handling of litigation. In each of the cited cases, benefits for total disability were refused. The facts of those cases and the present one compel entirely different determinations.

The cases of *Azevedo* v. *Mutual Life Ins. Co. of N. Y.,* 308 Mass. 216 [31 N. E. (2d) 559, 561]; *Fricke* v. *Mutual Life Ins. Co. of N. Y.,* 152 Kan. 525 [106 Pac. (2d) 677]; *New York Life Ins. Co.* v. *Stoner,* 109 F. (2d) 874; and *Mutual Life Ins. Co. of N. Y.* v. *King,* (Tenn. App. decided December 10, 1940 [C. C. H. 4 Life Cases 1066]), are also factually different from the present one. In each of them, recovery for total disability benefits was denied a farm operator who, although incapacitated from engaging in manual tasks, was able to, and did, manage, supervise and direct the operation of his farms and attend to all the business in connection with them. The evi-

dence in this case shows that the respondent is unable to inspect his lands, direct the labor in progress or perform any other essential supervisory functions.

A case strikingly similar to the one at bar is *Mutual Life Ins. Co. of N. Y.* v. *Dowdle,* 189 Ark. 296 [71 S. W. (2d) 691]. There, the insured was a manager of three ranches, one of which he owned. Prior to the accident, he gave these farms active and efficient management, riding horseback to them and walking over the land. He sustained a fractured coccyx, a bad case of fallen arches, and like respondent, suffered from varicose veins. After these injuries, he was no longer able to give any detailed attention to farm management, although he performed certain of his former duties such as preparing mortgages, signing contracts, and attending to his banking. He could not stand for any length of time or walk any considerable distance. Again, like respondent, he drove to the farms but he did not leave his car as "he could not walk about the farm as its proper supervision required that he do." The court, distinguishing *Aetna Life Ins. Co.* v. *Person, supra,* affirmed a judgment based upon a verdict finding him totally and permanently disabled.

To the same effect is *Manuel* v. *Metropolitan Life Ins. Co.,* (La. App.) 139 So. 548. There the insured was a farmer who owned and personally supervised a farm of some 300 acres. He was afflicted with pulmonary tuberculosis, affecting both lungs and requiring him to remain in bed a part of the time. As a result, he abandoned the management of his farm to tenants. Occasionally, he rode horseback over his fields to examine his crops. He consulted with officers at the bank about his business matters and held conferences with his tenants concerning the crops grown on his place. In affirming a judgment for the insured, the court held that he was totally disabled from performing any work or engaging in any business for profit. In other cases, the insured farmer recovered benefits for total and permanent disability under a policy having a clause similar to that now under consideration, although the evidence showed that he was able to perform unimportant work incidental to his occupation. (*Fitzgerald* v. *Globe Indemnity Co. of N. Y., supra; Fogleson* v. *Modern Brotherhood, supra; National Life & Acc. Ins. Co.* v. *Bradley,* 245 Ky. 311 [53 S. W. (2d) 701] ; *Davis* v. *Midland Casualty Co.,* 190 Ill. App. 338.)

The second question for decision concerns the insurer's contention that the respondent is not entitled to disability benefits because he refused to submit to a medical examination. This defense is based upon the following provision of the policy: "The Company may from time to time demand due proof of such continued disability, and any medical adviser of the Company shall be allowed to examine the person of the Insured in respect to any alleged permanent total disability, in the manner and at such times as the medical adviser may require but not oftener than once a year after such disability has continued for two full years. Upon failure to furnish such proof, or if it appears that the Insured is no longer wholly disabled as aforesaid, no further premiums shall be waived nor income payments made."

Following the presentation of proofs of disability, which included reports made by the insured's physicians, the company commenced payments on May 2, 1938, and made five consecutive monthly payments of $200. Because of information received by it in September, to the effect that respondent was actually engaged in supervising his farms, no payment was made on October 2nd. Shortly after, the insured submitted to the company a report made by one of his physicians under date of October 20th stating that he was "permanently partially disabled"; able to "partially supervise" but unable to perform actual labor. The company then wrote him: "Since your total disability actually ceased some time ago, we must now advise you that the income payment of $200. made to you as of September 2, 1938, on the assumption that your total disability was then continuing must be the last on account of your present claim for totally disabling benefits in accordance with the terms of your policy."

The insured made no reply to this letter until March 31, 1939, when his attorney wrote to the insurer claiming disability benefits for him and threatening legal action. The insurer's answer was that, in its opinion, his disability was partial only but it would be "most pleased to receive proof thereof." Forms for submitting proof of disability were enclosed. Other correspondence followed, and on May 24th, the respondent submitted a medical report by Dr. Hillyer to the effect that he was totally disabled. The respondent also indicated his willingness to submit to an examination by the insurer's physicians.

Accepting this offer, the insurer wrote to the respondent on June 5th, requesting him to report to three named doctors in San Francisco one week later. On June 7th, respondent's attorney by telegraph informed the insurer that it was "impossible for Erreca to keep appointments, letter follows." On June 21st, the insurer acknowledged the receipt of the telegram and stated that it had not received the letter referred to. It also requested him to arrange an appointment for a physical examination by their physicians in San Francisco. In reply to this letter, the respondent flatly refused to submit to any examination. The insurer's answer is dated June 23rd. It requested the respondent to furnish a sworn statement as to his disability and reaffirmed the demand for a physical examination.

"The insurer shall have the right and opportunity to examine the person of the insured when and so often as it may reasonably require. . . ." (Sec. 10,339, Ins. Code.) Such a requirement is a reasonable one and the right periodically to examine the insured for proof of continued disability is a condition to the future liability of the insurer provided the policy so recites. (*Mobley* v. *New York Life Ins. Co.*, 295 U. S. 632 [55 Sup. Ct. 876, 79 L. Ed. 1621; 99 A. L. R. 1166]; *Wood* v. *Industrial Life & Health Ins. Co.*, 223 Ala. 345 [135 So. 583]; *Daste* v. *First National Life, Health & Acc. Ins. Co.*, 14 La. App. 565 [130 So. 572]; *Rocci* v. *Massachusetts Acc. Co.*, 226 Mass. 545 [116 N. E. 477]; *Tompkins* v. *Pacific Mut. Life Ins. Co.*, 53 W. Va. 479 [44 S. E. 439, 97 Am. St. Rep. 1006, 62 L. R. A. 489]; 33 C. J. 20.) An analogous provision of a fire insurance policy concerning an examination of the insured under oath has also been upheld. (*Hickman* v. *London Assur. Corp.*, 184 Cal. 524 [195 Pac. 45, 18 A. L. R. 742]; *Bergeron* v. *Employers Fire Ins. Co.*, 115 Cal. App. 672 [2 Pac. (2d) 453].)

The respondent takes the position that the right of the insurer to a physical examination does not exist, or is waived, where it has previously denied liability under the policy. But denial of liability is not a waiver of the right to a physical examination where it is based upon a report of the insured's physician submitted in connection with the claim for benefits. Moreover, the right of the insurer survives its denial of liability regardless of the basis thereof.

To hold otherwise would mean that once an insurer has

refused to pay disability benefits, the insured is forever relieved of all future obligation to furnish proof of continued disability or to submit to reasonable requests for physical examination, notwithstanding the fact that the liability of the company under the express terms of the policy depends upon the insured's continued disability. A contrary conclusion is compelled by the very nature of disability insurance. Such a policy constitutes a continuing contract for periodic installment payments depending upon the insured's continued disability, and he has no cause of action, nor the insurer any liability, except for benefits which have accrued. Because the insurer's liability for future benefits is contingent upon the existence of total disability at that time, its refusal, for any reason, to pay benefits does not entitle the insured to treat the entire contract as repudiated and ask for future benefits upon a theory of anticipatory breach (*Brix* v. *People's Mutual Life Ins. Co.*, 2 Cal. (2d) 446 [41 Pac. (2d) 537]; *Cobb* v. *Pacific Mutual Life Ins. Co.*, 4 Cal. (2d) 565 [51 Pac. (2d) 84]; *New York Life Ins. Co.* v. *Viglas*, 297 U. S. 672 [56 Sup. Ct. 615, 80 L. Ed. 971].) As the refusal to pay is not a breach of the contract as to future unmatured benefits, the policy, including the provision for continued proof of disability and physical examination remains in force as to all such accruing or future benefits. Accordingly, irrespective of the position it has taken concerning its liability for accrued benefits, an insurance company may nevertheless request a physical examination under the policy provision to determine its accruing and future liability. (*Eller* v. *Guthrie*, 226 Iowa 467 [284 N. W. 412].)

In attempting to avoid the effect of his refusal to submit to examination, the insured argues that the provision of the policy in that regard is inconsistent with the preceding paragraph of the policy which provides: ''Under this contract disability shall be presumed to be permanent when it is present and after the insured has been continuously so disabled for not less than three months.'' According to the respondent, this provision of the policy creates a conclusive presumption that a three months' disability is total and permanent, and where, as here, the insurer has paid disability compensation for five consecutive months, the presumption comes into play, making it wholly immaterial whether or not he refused to submit to a physical examination. He invokes

the principle that conflicting and uncertain provisions must be resolved most strongly against the insurer and in favor of the insured. This contention is wholly unsound.

In a literal sense no one knows whether disability is permanent until the death of the insured, and a disability which at the outset appears to be of lasting and indefinite duration may be in fact otherwise. Accordingly, in many cases it was held that the insured's probable physical recovery from a totally disabling illness defeated his claim for total and permanent disability benefits, and in others it was held that the recovery of the insured disentitled him to benefits for the period in which he was totally disabled (*Ginell* v. *Prudential Ins. Co.*, 237 N. Y. 554 [143 N. E. 740]. See also many authorities cited in *Job* v. *Equitable Life Ins. Co.*, 133 Cal. App. [Supp.] 791 [22 Pac. (2d) 607].)

To obviate the difficulties of proving "permanence," and to prevent the insurer from recovering amounts previously paid upon the ground that a total disability was not permanent, as well as to give additional protection to the insured by according him benefits for a stipulated period of total disability despite a subsequent recovery, insurance companies commonly insert a provision in the policy giving a presumption of permanence to a disability which has continued for a specified length of time. This presumption relates only to the permanency and not to the totality, of the disability.

In *Dietlin* v. *Missouri State Life Ins. Co., supra,* the presumption was held to be conclusive, and the court refused to accept evidence for the purpose of showing that a total disability of three months' duration had terminated so as to deprive the insured of benefits for such period and any further period during which the disability continued to be total. And as stated in 110 A. L. R. 631, ". . . a disability which has lasted for the requisite period of time to render it presumably permanent within the meaning of the policy is nonetheless permanent, although it has since terminated; and that consequently an insured who has suffered such disability may, even after the termination thereof, recover benefits therefor as for permanent disability, *for the period during which it actually lasted.*" In other words, the conclusive presumption of permanency applies only so long as total disability exists; the clause is not to be construed as meaning that a three months' disability is forever presumed a permanent and total

one. The respondent's interpretation would require that a disability which was total for three months must be conclusively presumed to continue to be total and the insured entitled to benefits for the remainder of his life, even though in fact he completely recovered from his ailment. Under that interpretation an insured, upon proof of three months' total disability, would have a life annuity. Since the clause providing for the presumption of permanency does not prevent the insurer from disputing the totality of the disability, it is entirely consistent with the provision reserving to the insurer the right to insist upon periodic physical examination of the insured.

The finding of the trial court that the respondent did not refuse to submit to a physical examination was unquestionably based upon an erroneous construction of the terms of the policy, for the uncontradicted evidence is directly to the contrary. The record shows that, continuously from June 22, 1939, to the time of trial the insured refused to comply with the company's demands, made in accordance with the provisions of the policy, and he is therefore not entitled to judgment in this action for disability benefits subsequent to June 2, 1939. But as the evidence supports the finding that he was totally disabled from September 2, 1938, when the company made its last payment, to the date of refusal of a physical examination, the respondent is entitled to judgment for benefits during that period.

The judgment is therefore reversed with directions to enter judgment for the respondent for the sum of $1,600 as the amount of disability benefits to which he is entitled under the provisions of the policy to June 2, 1939. This judgment shall not be a bar to an action to recover any amounts which may be due on account of disability payments accruing under the policy subsequent to June 2, 1939.

Gibson, C. J., Shenk, J., Houser, J., and Traynor, J., concurred.

CARTER, J., Dissenting.—I dissent. I concur in that portion of the majority opinion which holds that plaintiff is totally and permanently disabled and therefore entitled to disability payments under the policy, but I dissent from that portion of said opinion determining that the insured was not entitled to disability payments after the insured's

refusal of the insurer's demand that he submit to a medical examination. As set forth in the opinion, the clause in the policy on that subject reads: "The company may from time to time demand *due* proof of *such continued* disability, and any medical adviser of the Company shall be allowed to examine the person of the Insured in respect to any alleged permanent total disability, in the manner and as such times as the medical adviser may require but not oftener than once a year after such disability has continued for two full years. Upon failure to furnish *such* proof, or if it appears that the Insured is no longer wholly disabled as aforesaid, no further premiums shall be waived nor income payments made."

There are several reasons why that clause should not debar plaintiff from obtaining payments during the period following his refusal to submit to a medical examination by the insurer's physician. In the first place, it will be noted that the clause provides for two things the insurer may do with respect to demanding evidence of disability, to-wit: (1) The company may demand *due proof* of *continued* disability; (2) Have the insured examined by the insurer's medical adviser. These two things are separate and distinct. They are divided by a comma, and are not the same. "Due proof" might well consist of a medical report by the insured's own physician. While the second provision is for a specific kind of proof, that is, examination by the insurer's physician. Turning then to the latter part of the provision here in question which specifies what the *penalty* is for a violation thereof, we find it states that upon failure to furnish *such* proof, no further payments shall be made. The word "such," manifestly refers to "due proof" rather than an examination by the insurer's physician. This is apparent when we consider that the penalty arises for failure to "furnish" the proof. It could hardly be said that the insured was furnishing the proof by submitting to an examination. Here the insured did furnish proofs consisting of his physician's report. The payments could not therefore be stopped for any failure in that respect. There is no clause authorizing the discontinuance of payments for failure to submit to a medical examination, therefore the insurer had no authority to discontinue the payments. This interpretation of the clause in the policy is entirely appropriate when we give heed to two fundamental rules, namely, that a policy of insurance is to

be construed most strongly against the insurer and in favor of the insured and that an interpretation which will avoid a forfeiture is to be adopted when possible.

Secondly, the insurer had breached the contract at the time of the refusal to submit to an examination. Under those circumstances the insurer should not be permitted to assert nonliability for the failure to so submit. Its right to insist upon an examination should be confined to those instances where it is performing the contract, making the payments. The case is not dissimilar from a clause in fire insurance policies which provides that the insured must submit to an examination under oath before he may recover for a loss. It is held that that provision is waived by the insurer when he denies all liability under the policy. (*State* v. *Becker,* 336 Mo. 59 [77 S. W. (2d) 100].)

Third, it should be remembered that the insurer was not prejudiced or injured in any way by the failure of the insured to submit to the examination. He was examined by the insurer prior to the trial and therefore the insurer was not prevented from obtaining evidence with respect to the insured's physical condition. Even after the insurer obtained a report from its own physician as to insured's physical condition, it still denied liability. The trial court found against the insurer on this point and this court has sustained the finding of the trial court on the issue of total disability. Therefore, even if the insured had submitted to the insurer's request for an examination by the latter's physician, the insurer would still have refused disability payments as it still contends that insured is not totally disabled.

In my opinion the judgment should be affirmed.

CURTIS, J., Dissenting.—I am unable to agree with that portion of the majority opinion which holds that during the period of time just prior to the rendition of the judgment the plaintiff was totally disabled and therefore entitled to receive disability payments during said period of time. From the evidence in the record it must be assumed that this condition is permanent, and therefore the effect of the opinion, if permitted to become the final decision of this court, will entitle the plaintiff to receive total disability payments during the remainder of his life.

The majority opinion adopts the definition of total disa-

bility given in *Hurwit* v. *Prudential Ins. Co. of America,* 45 Cal. App. (2d) 74, 81 [113 Pac. (2d) 691], which holds that total disability is "a disability which prevents his [the insured's] working with reasonable continuity in his customary occupation or in any other occupation in which he might reasonably be expected to engage in view of his station and physical and mental capacity." I am in accord with this definition of the term "total disability," but does the evidence in this case by any reasonable interpretation show that the condition of the insured during the time in question prevented his working with reasonable continuity in his customary occupation? It is conceded by the majority opinion that while in his then condition plaintiff could perform no manual labor, his mental faculties were unimpaired. He was able to drive an automobile and frequently drove to his farms. He was able to negotiate leases, arrange finances for crops, buy supplies, and participate in selling his grain. As stated by his physician, he "could perform all the secretarial work connected with the farm." Since his accident he has participated in the negotiation of leases, has signed notes, negotiated loans, talked to grain buyers, and has attended to the buying of crops. While the actual conduct and control of farm operations has been left in the hands of his son, he held conferences with his son regarding the transactions incident to the actual operation of the farms, such as the kind of crops to be planted and the time and price for the selling of such crops.

With this undisputed evidence before us, can it be said that the plaintiff was totally disabled? Total disability, as we have seen, is defined as a condition which prevents the insured from working with reasonable continuity in his customary occupation. The above evidence shows that during the entire period covered by his present claim, the plaintiff has worked continuously in his customary occupation. It is true that he has not performed all the duties required of that occupation, but it is equally true that he has performed at least some of said duties. Moreover, it cannot be disputed that he has performed not only a substantial part of such duties, but a most important part of those duties.

The present case cannot be distinguished from the case of *Dietlin* v. *General American Life Ins. Co.,* 4 Cal. (2d) 336 [49 Pac. (2d) 590]. That case holds that where the insured's

duties are twofold, as were the duties of the plaintiff in this case, and the injury prevented him from performing one class of such duties but did not render him unable to perform another and substantial part of such duties, such injury is not total, and the insured is not entitled to recover under a policy of insurance providing for benefits in case of total disability. The conclusion of the court in that case is contained in the following paragraph of the decision, at p. 345:

"There is no contention that it is necessary that appellant be helpless and unable to perform any of his daily duties, to constitute total disability. However, where he is disabled only from performing one or more of those duties, and is able to perform others, he is only partially disabled. It was so held on the former appeal, where it was said: 'Although the evidence was sufficient to show that after November 22, 1929, he was disabled from performing "one or more important daily duties pertaining to his occupation," such disability was clearly a partial disability and not a total disability as defined in the policy as he was not disabled from performing "any and every duty pertaining to his occupation." ' "

While I do not contend that the rule announced in the majority opinion requires that the disability, in order to be total, must render the insured incapable of performing "any and every duty pertaining to his occupation," it does seem both logical and reasonable to hold that when the insured is able to perform not only a substantial, but the most important part of his former duties, he is not and cannot be totally disabled. While as a result of his injury, the plaintiff was prevented from performing any physical duties required in carrying on his farm operations, his mental faculties were unimpaired, and with the assistance of his son, who after his father's injury performed the physical work, he operated his extensive farming ventures to the same extent as before his injury.

A recent case decided by the Supreme Judicial Court of Massachusetts is very much in point. In that case the policy of insurance was practically the same as that carried by the plaintiff in the present case at the time of the injury. The insured was a farmer and with the assistance of three employees, he performed all the work upon the farm. After his injury he employed a fourth. Due to his injury he was unable to perform any manual labor about his farm. The case was decided upon an agreed state of facts. The conclusion of the court was as follows: "Upon the agreed facts it is plain

that the insured is unable to perform the manual labor he had previously done, and that the restriction of his activities in this respect is due to the impairment of his right arm and hand. The record does not disclose that this impairment is accompanied by any pain or suffering. His disability has not been shown to come within the terms of the policy. Indeed his disability has not prevented him from continuously supervising and managing the operations of his dairy and farm as a means of a livelihood. (citing numerous authorities.)'' (*Azevedo* v. *Mutual Life Ins. Co. of N. Y.*, 308 Mass. 216, 219, 220 [31 N. E. (2d) 559, 561].)

I think that both reason and the authorities impel a reversal of the judgment.